Good morning, Council. Good morning, Your Honor. Andrew Pletcher on behalf of Plaintiff Appellant Morrissey-Berru. May it please the Court. The District Court incorrectly granted summary judgment and found that my client was a minister under the ministerial exception first recognized by the United States Supreme Court in 2012. The 2012 decision, Hosanna Tabor. In making this ruling, the District Court failed to look at the totality of the circumstances or all of the circumstances of my client's 16-year employment as a 5th and 6th grade teacher at Our Lady of Guadalupe School. This error is especially apparent in light of this Circuit Court's most recent decision in December 2018, Kristen Beal v. St. James School, which also involved a 5th grade teacher at a Catholic school. In that opinion... Is it significant here, Council, that the termination or the decision not to renew the contract was made by the principal of the school and not a member of the clergy within the church? I mean, the Supreme Court in Hosanna Tabor says that the exception ensures that the authority to select and control who will minister to the faithful is the churches alone. Did the church make the decision not to renew the contract, or did the secular principal of the school, who there's no argument in this case is a minister or a clergyman, is there a distinction here as to who the decision-maker is, as to whether or not the exception applies or doesn't apply? I think certainly you can make that distinction. However, we do have to say that the principal is acting on behalf of the school, which in turn is acting on behalf of the church. So I would certainly say that it does kind of cut both ways. She is in a secular role. She's not formally acting on behalf of the church, but she is representative of, like I said, the school and then subsequently the church. In the 2018 Beall opinion, the court noted that reliance on function alone, as the district court found, incorrectly found, reliance on function alone would render most of the analysis of Hosanna-Tabor irrelevant dicta, as one's function was but one of four considerations raised by the court in Hosanna-Tabor. Counsel, are you still pressing the claim regarding the part-time position? We are, our entire claim certainly we are pressing, yes, Your Honor. Is that claim barred as untimely? Your Honor, I don't believe it is. Why not? In our reply brief, we discuss, starting on page 22, we discuss that determination of whether the statute of limitation applies really runs into whether the plaintiff has a complete and present cause of action. It's our position that in terms of her part-time position, she didn't have a complete and present cause of action until she actually began in her part-time position. What case supports that notion that when the effect of the decision is obvious that the statute begins to run? What case supports that? I would say two cases. One, the Green v. Brennan, 2016 in the United States Supreme Court, for that general principle that it starts running when the plaintiff has a complete and present cause of action. But I think more importantly the plaintiff has a complete and present cause of action when she was informed that she would be transferred to part-time. Because I think contractually, you have to look at it in terms of, we look at it in terms of contract law. Between the time in which she's informed that she'll be a part-time into a part-time position and by the time she actually begins working in that part-time position, there certainly is a period of time in which the school could change her, could change their mind in which the type of role that she wanted to be, excuse me, the type of role that the school wanted to place my client into. And I think also. You said Green v. Brennan was one case that supports your position. And what's the other one? Yes. In Romano v. Rockwell International, it's actually a California Supreme Court case. Okay. We'll scratch that one. So Green is the only federal case you have? Well, the only reason I bring up the California Supreme Court case is that they do actually get into an analysis of federal law in terms of how they frame the issue for purposes of the Fair Employment and Housing Act. But that's not binding on us. So the Green decision is the only binding precedent that you have that supports your argument that the part-time position is not untimely? Yes, under those circumstances, yes. Hasn't this circuit held that in employment discrimination cases, the proper focus is on the time of the discriminatory acts and not upon the time in which the consequences of the acts become most painful? I guess I'd like to follow up on what Judge Rawlinson was asking you. Here it seems the discriminatory act you allege was plaintiff's demotion going down to the part-time job. You don't seem to point to any case law showing that an ADA claim for unlawful demotion becomes a complete and present cause of action only when a person commences employment in that demoted role. And to answer that, Your Honor, I'd like to point to 29 U.S.C.A., Section 626D3. We actually have in our reply brief, page 28, footnote 4, we put that out in full. Under the ADEA, it is indicated a statutory intent to, I'll just read in part. For purposes of this section, unlawful practice occurs with respect to discrimination and compensation in violation of this chapter when a person becomes subject to discriminatory compensation decision or practice or when the person is affected by the application of the discriminatory compensation decision or otherwise practiced. And for that, again, we come back to the fact that she didn't fully receive the full effect of her demotion until the time in which her compensation was essentially halved because she was in a part-time position. Counsel, what's the precise language in green that you're relying upon? One moment, Your Honor. Again, the green decision in terms of the way we cite it actually is for the general principle in terms of when a, for statutory purposes, the plaintiff has a complete and present cause of action. I would note that in the discussion in green, it says a cause of action does not become complete and present for limiting purposes until the plaintiff can file suit and obtain relief. This is the standard rule, which then in turn can be displaced such that the limitation period begins to run before plaintiff can file suit. Courts will not infer an odd result in the absence of any such indication in the text of the limitations period. Counsel, I'm reading on page 1777. It says the claim accrues when the employee is fired. So not the effective date of the termination, but when the employee is actually fired. So by analogy, the claim would accrue for your client when she was demoted, not when the effective date of the demotion arrived. But again, our position is that demotion actually didn't occur until she began in her position that fall in teaching part-time. Because much like Mr. Green, who was constructively discharged or was terminated, the effective date literally isn't until Mr. Green walks out the door and is no longer receiving his pay. You can be told that you're going to be terminated, but essentially between the time that you're being told you'll be terminated and when you actually feel the effect of it, that's when the cause of action should occur. Counsel, do you have a case? That's totally the opposite of what our cases appear to say. That that's the effect. When he's actually out the door, that's the effect. If he's terminated six months before he leaves, the effect is six months later, but the effect is six months later. But I think, Your Honor, I think also we need to look at this through the practical considerations of the merit of the application. The practical considerations here is that it's in essence confusing for an employee if for purposes of bringing a claim under the ADEA and dealing with the EEOC is she certainly began feeling the effects of her demotion at the time in which she received half her pay. Like I said before, the school could certainly change their mind. They could, you know, repudiate the contract in total, give her a brand-new contract. There's many different ways it could go before she actually began feeling the effects. But she knew she had been demoted when she was apprised of the demotion. She knew then that this adverse action had been taken against her. I understand, but we keep coming, we come back to the... Perhaps we should move on to something else, because I think you have a different perspective on how to read this, perhaps. So we understand your position if you want to move on to something else. Let me ask a question, counsel. Given that the Supreme Court tells us in Hosanna-Tabor that this is a totality of the circumstances analysis, whether a serial exception applies or doesn't apply, and in light of this circuit's precedent in Beale, how much difference should it make in this case that in this case the teacher actually led her classroom in prayer, both prescribed written prayers and spontaneous prayers, whereas in Beale the teacher did not pray with the students at all? How much or how little impact should that weigh in the totality of the circumstances analysis? Well, I think that is a factor in there, but I think you have to pull it also back and look at what she did testify to in the record, page 277. She testified that she didn't lead a religious service, did not have any input in selecting hymns, did not deliver a religious message, did not prepare her students to alter serve during weekly mass. Other functions of her position should also play into any... I agree with you it's a totality of the circumstances, but I'm not asking you about what she didn't do. I'm asking you about what she did. Is that a major factor? Is that a minor factor? How should we properly weigh the distinction between this case in Beale, where the two competing teachers, one led the students in prayer, one didn't? I think it plays into a factor. I don't think it's significant, because I think there is a component there of, you know, the significant religious service or significant position of significant leadership in which how did the students view her. And the fact is that she was not getting up there leading religious services. And then when you put in all the other factors in accordance with it, I don't think that simply praying with your students immediately makes you a minister under the exception, especially in relation to function alone. Along that line, what do we make of the concurrences by Justice Alito and Kagan and Hosanna Taylor regarding their comments on the functional approach? I mean, which commented on our Ninth Circuit's functional approach and the functions and duties of the individual for purposes of determining whether or not they're a minister. How significant is that? What's your view on how we should consider that? Sure. I'm just shy of two minutes. I'd like to reserve just a minute of my time, but I'll be happy to answer that. Justice Alito's concurring opinion, which serves as the basis of their papers, my opponent's moving papers, or responding papers, really some important distinctions. Number one, Justice Alito does not say that title or theological education and background should not be considered. The way he frames the issue is it's a warning to courts that each case should be looked at individually and on their merits and can't be viewed under a single lens of you need to find a title, you need to find theological or some kind of specialized educational makeup. So I think those title and education must be considered. I think also in looking at function, while he states that the Alcazar decision and functional consensus approach is left undisturbed, I think then it gets back to the way that it's left undisturbed, but it's left undisturbed. But it has been significantly changed. I think it's been changed because we've gone from functional consensus to totality of the circumstances, and then it's properly reweighed in the subsequent cases from the Kanada case in 2012 all the way up to Beale. You see that it's been weighed in relation to the totality of the circumstances. Then I think just in general, we have to remember this is a concurrence. There was only two justices that voted in concurrence. And you did see a unanimous opinion coming out of the majority. I think it would be significantly different if they split on that particular issue. Good morning, Your Honors. May it please the Court, John Manier of Ballard, Rosenberg, Gulper, and Savitt for the Apolli Lady of Guadalupe School. This case concerns government interference with an internal church decision that affects the faith and mission of the church itself, specifically a source of religious instruction who performed an important role in transmitting the Catholic faith in the next generation and conveying the church's message and carrying out its mission. Well, that's only true if the Hosanna-Tabor functional, the four foundational sort of approaches are met. Well, Your Honor, I was actually reading from Hosanna-Tabor except for the word Catholic. I believe that that description fits our case. And I think that's really the crux of the case today. And tell me why it does and what's your best arguments for why it does. Well, I believe our best argument is that this is a bedrock right under the First Amendment, the right for a religious entity to be able to minister its faith. And that begs the question, because we have to determine whether or not the teacher was a minister as opposed to a teacher. So what in the record supports the notion that under the totality of the circumstances this teacher was a minister? Well, if we're to look at the four considerations that were discussed in Hosanna-Tabor, in the context of the four considerations, it's not a four-factor test. Three, I would say three of those considerations weigh strongly in favor of finding that Ms. Morsi Beru was a minister. Obviously, I don't think there's any dispute that she performed important religious functions. She taught religion five days a week. She taught her students how to pray. She led them in prayer. In evaluating this, let me see, it seems that the plaintiff's title was secular, correct? She was a teacher at all times? The title itself, the bare title, is the only factor that weighs against us. Okay. And she took a single course in the history of the Catholic Church? Well, she took, actually her testimony was that she took it multiple times. She did not hold herself out to the public as a minister? I beg to differ. The record actually demonstrates that she, first of all, her duties said that in both her professional and private life, she was expected to model and promote her behavior. How did the provisions of her employment contract, which is a private document between the school and the teacher, how does that rise to the level of a public representation? Well, the church expected her to make a public representation. Now, how well she did or did not do that is the very type of entanglement that I think the First Amendment prohibits. Of being a minister? Did the church expect her to hold herself out as a minister or as a representative of the Catholic faith? Which is a difference. Well, she's a minister of the faith. Is she an ordained minister? No. There are two public activities that she undertook that were out in the public, that are in the record. First, on her own accord, every year going back to 2006, she took her students to Our Lady of Angels Cathedral in downtown L.A. to tour the cathedral and also to allow the students to experience serving at the cathedral altar. So if she took her students on a field trip to NASA, does that make her an astronaut? Of course not. But there's no astronaut exception to the law. And that's a good point, counsel. We're talking about an exception. We're not talking about the rule. And my concern is that we may be headed down a path where the exception swallows the rule to some extent if we're not careful. I understand Justice Alito and Kagan's concurrence to make it clear that in some religious organizations, there's not the overt structure and hierarchy that there are in others. And in those, there may not be a person clearly delineated as a minister. That's all well and good, but that's not the case here. This is a very structured religious organization with a very clear and distinct hierarchy. And you're not telling us that a fifth grade or a sixth grade elementary school teacher at a Catholic school is the same thing as a seminary-trained priest who's gone through a formal ordination and is a vocational lifetime minister, are you? Of course they're not the same thing, but they both have one thing in common. They're both ministers. And they're entitled to the same exception? Yes. Would you agree that the plaintiff here did not hold herself out to the public as a minister, at least not in the way the plaintiff did in Hosanna Tabor? Not in the same way as Hosanna Tabor. You agree with that? I agree with that, but that's also not a floor for being a minister or for even satisfying the actual phrase in Hosanna Tabor is her own use of the title. What overt acts did she undertake that would represent to the public she was a minister? She directed and produced a performance by her students of the Passion of the Christ as part of the Easter celebrations. That in addition to taking her students very publicly every year to the cathedral downtown and allowing them to serve at the cathedral altar. Those are very public acts. Counsel, how does this case differ from Beale? How does it differ? Well, first of all, we do submit that Beale was wrongly decided. Well, that doesn't help you. Well, a couple of you may have something to say about that. We cannot overturn our precedent. A three-judge panel is bound by a prior ruling of the circuit. So telling us it's wrong doesn't get you very far. Tell us why we should not be persuaded that Beale controls the outcome of this case. If I can just say one more thing about that, there is a petition for rehearing en banc that is still pending in Beale, so it's a little different. So that's why I said a couple of you may have something to say about that at some point. And there's one other precedent that I think the court needs to look at, its own precedent, and that's the Puri v. Calsa case. And Puri says... Well, could you address Beale? Yes, I will address the differences with Beale, but I want to get back to Puri. I'll answer my question first, and then you can tell me what you want to say. Of course, Your Honor. So I think the differences here are, as Your Honor pointed out earlier, is the participation in prayer is different. Beale's testimony was that she didn't do it at all. Morrissey Beru was actually quite open about the fact that she did accept the duties that she had. She got in the contract, and she understood them to be her duties. She had to undergo religious training. I'm going now to the substance reflected in the title. She had to go through multiple... If I say she, who do you mean? I'm sorry, Morrissey Beru. As opposed to the one single course, which wasn't even exclusively about religion that was discussed in the Beale opinion, Ms. Morrissey Beru acknowledged that she, through these multiple courses that she took, learned about the Bible, the history of the Catholic Church, and another factor that is missing in Beale is that she obtained a catechist certification to demonstrate that she was knowledgeable in the Catholic religion, which is very important, because the church's message is only going to continue to be about the Catholic Church. It's not going to exist if it is taught to the next generation. That's an extremely important point. And in fact, there's language in the concurrence by Justice Alito in the Hosanna-Tabor case that suggests that teachers of religion, at least, are generally going to be subject to the ministerial exception, because they are ministers of the faith, that they are promulgating the faith to the next generation. But dicta in a concurring opinion is not binding. It's not binding, but it's been found persuasive by multiple federal courts of appeals. Another thing about that opinion, and I guess I am sort of going back and forth, because I want to address Judge Rollinson's question, and I don't want to leave that hanging here, because she did specifically ask me to distinguish the cases. So, Ms. Morrissey Beru specifically agreed that the mission of the school where she taught religion is to develop and promote religious education, promote Catholic school faith community within the philosophy of Catholic education as implemented at the school, and the doctrines, laws, and norms of the Roman Catholic Church. All of her duties and responsibilities of the teacher, not just in teaching religion, but even in teaching everything else, shall be performed within this overriding commitment. So that pervaded her employment, even though we don't use a stopwatch to tell how often she taught religion, although the record does show she taught at least three times. And she taught it every day. Counsel, what do we do with Ms. Morrissey's testimony that she was neither called to her position, nor does she believe she was accepting a former call to religious service, and she didn't even consider herself a practicing Catholic? What do we do with that, those statements? First of all, I think she was a practicing Catholic while she was a teacher. She might have left the faith afterwards. So I'm not sure that reflects what the record says. Let's assume that that's what the record says. Yes, well, I am going to assume that. But that cannot be determinative. That's how she holds herself out, though. That's how she self-identifies. That's a bit different than her use of the title, where she may subjectively think, I'm not a minister, I'm not even a Catholic, but that's what the record says. You say people can be ministers without designating themselves as ministers, so that she can be designated a minister despite her not seeing herself as a minister? Because the primary determinant, and this is what Puri says, is the job duties. So if you have the job duties of a minister, if that is your job, then the fact that maybe in your heart of hearts you don't really believe in it, or you don't even want to believe in it, that's a different thing. And the fact that you don't even consider yourself a Catholic isn't determinative. It would be highly unusual for someone to be a minister without considering themselves to be a minister. I would think so, but that's still not the test. There's no case which says that that's the test. Because it's how that person holds themselves out. So if the person does not hold themselves out to be a minister, how can you say they're nevertheless a minister? Because of their duties, because of what the church has entrusted them to do. And they came in knowing what they were expected to do, and knowing that they were expected to conduct themselves and to teach the faith, teach their children how to pray, and do everything that the church expected of a teacher of religion. Let me ask this, counsel. Understanding that there are religious bodies, the Amish, for example, that have no vocational ministers, everyone that ministers is a lay minister. But yet in this context, there's a very clear line between the laity and the clergy. And there are clearly various distinct levels of vocational ministers within the priesthood and the hierarchy of the church. Should we grant the same exception in the context where there's a vocational ministry that's well-established and structured to the laity that is primarily engaged in teaching English and other secular subjects, but may ancillarily teach religion or lead catechisms or prayers that are prescribed? Where we have both a laity and a vocational clergy, should we give both the same exception? I would say that if as long as the factors fit the test, you absolutely should. And in fact, to treat the religions differently on that basis is the type of entanglement that the First Amendment prohibits. For example, saying that it's... There are religious bodies out there that are highly different in their structure and their practice, and that we have to take those realities into account in the totality of the circumstances analysis. You do, but that's when you're talking about those other religions that may not identify people, ordain people, or what have you. She wasn't ordained. She didn't carry a title other than teacher. She's not a part of the vocational professional clergy in the church here. I understand, but so, Your Honor, basically, if I can sort of recapture... It seems to me you're trying to equate the seminary-trained, ordained priest with the elementary school teacher, and that's where I have a problem. I'm not equating them. I'm saying they have one thing in common. And I'm not saying all teachers. For example, you use the word ancillary. Well, let's suppose you have a circumstance where someone only teaches religion five minutes a week. Well, I don't think that's realistic. I don't think anyone who's been in class actually has experienced a five-minute lesson. And at that point, you might want to look into whether the religious entity is using this as a subterfuge to get around the employment laws. That might be the case. All right, counsel, let me ask you this. You would agree that the district court did not have the benefit of Beale when this case was decided. Right. So in the event that Beale survives the en banc process, would it be prudent for us to remand this case for the district court to consider it in light of Beale? Well, I think that would be one of the potential prudent options, although we believe that even if Beale does survive, we believe that our facts are strong enough, especially the plaintiff's own testimony about her job duties and how she performed her job duties. And the important thing from the Puri case that I never got to say, Puri says that an employee whose job duties reflect a role in conveying the church's message and carrying out its mission, which is Ms. Morsi Beru to a T, is likely to be covered by the exception. It didn't say it's going to be covered by the exception as long as one of the other elements is present. And in fact, in both the Cannata case, which is cited in the briefs, that's the Fifth Circuit case, and also the Temple Emanuel case from Massachusetts, which is also cited in the briefs. In both of those cases, although they did not come out and say function alone is enough, in fact those cases were function alone cases. Thank you so much, Your Honor. Just very briefly, I want to make one statement of what we're requesting here today. We're requesting that, especially in light of Beale, that this Court reverse the District Court's granting of summary judgment on the issue of the ministerial exception. We would ask that the Court remand it back to the Court for further proceedings, and especially in light of whether there are disputed issues of fact so that it can consider a summary judgment. Number two, I just want to point out there's a lot of discussion from opposing counsel regarding this trip to Our Lady of Angels Cathedral in downtown L.A. This really, I caution that opposing counsel here conflates and collapses the considerations raised in Hosanna Tabor in terms of totality of the case. This is a trip to Our Lady of Angels Cathedral to fit it all into the different categories in which he needs to for purposes of his argument. The trip to Our Lady of Angels Cathedral, to us, is two things. Simply walking around your students is no different than the Beale in which she took her kids to the particular weekly services. No different than a parent volunteer who would be walking around their kids, and I've exceeded my time. Thank you, counsel. Thank you to both counsel.
judges: Rawlinson, Murguia, Gilstrap